**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILDEARTH GUARDIANS; GRAND
CANYON WILDLANDS COUNCIL;
WILDLANDS NETWORK; SIERRA
CLUB,

*Plaintiffs-Appellants*,

v.

HEATHER PROVENCIO, in her official
capacity as Kaibab National Forest
Supervisor; UNITED STATES FOREST
SERVICE,

*Defendants-Appellees*,

and

STATE OF ARIZONA, on behalf of
Arizona Department of Game and
Fish; SAFARI CLUB INTERNATIONAL,
*Intervenors-Defendants-Appellees*.

No. 17-17373

D.C. No.
3:16-cv-08010-
SMM

OPINION

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, Senior District Judge, Presiding

Argued and Submitted February 7, 2019
Phoenix, Arizona

Filed March 13, 2019

Before:  MICHAEL DALY HAWKINS, MILAN D.
SMITH, JR., and ANDREW D. HURWITZ,
Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

**SUMMARY**[*]

**Environmental Law**

The panel affirmed the district court's summary judgment in favor of the United States Forest Service in an action by plaintiff environmental groups challenging travel management plans implemented by the Forest Service to permit limited motorized big game retrieval in three Ranger Districts of the Kaibab National Forest.

The Travel Management Rule, promulgated by the U.S. Department of Agriculture for Forest Service lands, generally prohibits off-road, motorized travel, but permits the "limited" use of motor vehicles within a specified distance of "certain" forest roads for the purposes of camping or retrieval of downed big game animals.  The panel rejected plaintiffs' contention that the Forest Service violated the Travel Management Rule by implementing plans that did not sufficiently limit motorized big game retrieval in the Ranger Districts.  The panel concluded that

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the Forest Service did not violate the plain terms of the Travel Management Rule.

Addressing plaintiffs' claims under the National Environmental Policy Act ("NEPA"), the panel held that the plaintiffs had standing to bring their NEPA claims because they were trying to protect the environment, which was within NEPA's zone of interests. The panel concluded that the environmental impacts discussed in the environmental assessments did not raise substantial concerns that necessitated the preparation of environmental impact statements. The panel held that there was no indication that the agency failed to satisfy NEPA's procedural requirements. The panel concluded that the Forest Service gave the requisite hard look and made determinations that were neither arbitrary nor capricious, and were consistent with the evidence before it; and accordingly, the Forest Service did not violate NEPA.

The panel held that the Forest Service conducted the required prefield work, consulted with the appropriate entities, and reached a determination with the evidence before it, and satisfied its procedural obligations under the National Historic Preservation Act.

**COUNSEL**

John R. Mellgren (argued), and Susan Jane Brown, Western Environmental Law Center, Eugene, Oregon, for Plaintiffs-Appellants.

Stuart Wilcox, WildEarth Guardians, Denver, Colorado, for Plaintiff-Appellant WildEarth Guardians.

Mark R. Haag (argued), Allen M. Brabender, Attorneys, Environment & Natural Resources Division; Eric Grant, Deputy Assistant Attorney General, Jeffrey H. Wood, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C.; M'Leah Woodard, Attorney Advisor, Albuquerque Field Office, Office of the General Counsel, United States Department of Agriculture, Albuquerque, New Mexico; for Defendants-Appellees.

Dominic Draye (argued), John LeSueur, Assistant Attorney General, and Mark Brnovich, Attorney General, Arizona Attorney General's Office, Phoenix, Arizona, for Intervenor-Defendant-Appellee State of Arizona.

Anna M. Seidman, Douglas S. Burdin, and Jeremy E. Clare, Safari Club International, Washington, D.C., for Intervenor-Defendant-Appellee Safari Club International.

**OPINION**

M. SMITH, Circuit Judge:

Plaintiffs-Appellants (Plaintiffs) are environmental advocacy groups that challenged travel management plans implemented by Defendant-Appellee United States Forest Service (the Forest Service) to permit limited motorized big game retrieval in three Ranger Districts of the Kaibab National Forest. The district court granted the Forest Service's motion for summary judgment, concluding that the Forest Service complied with the Travel Management Rule, the National Environmental Policy Act (NEPA), and the National Historic Preservation Act (NHPA). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual Background

#### A. The Kaibab National Forest

The Kaibab National Forest encompasses approximately 1.6 million acres of public land in northern Arizona, including Grand Canyon National Park. It is comprised of three noncontiguous Ranger Districts: the Williams Ranger District, the Tusayan Ranger District, and the North Kaibab Ranger District.

The Williams Ranger District is the southernmost, covering 560,305 acres approximately thirty-five miles west of Flagstaff and sixty miles south of Grand Canyon National Park. It includes the Kendrick Mountain Wilderness, which extends into Coconino National Forest and features a diverse array of vegetation including Douglas firs, white firs, ponderosa pines, and aspens. The Williams Ranger District also serves as a habitat for a number of endangered species,

including the Mexican spotted owl, the California condor, and the black-footed ferret.  It contains six areas where spotted owls are known to live and breed, and three spotted owl critical habitats overlap the District.

The Tusayan Ranger District, located just south of Grand Canyon National Park's south rim, encompasses 331,427 acres.  It features varied terrain, from ponderosa pine forests to grasslands, and is home to a number of sensitive species, including bald eagles, goshawks, peregrine falcons, burrowing owls, bats, and voles.

The North Kaibab Ranger District covers 655,078 acres immediately north of Grand Canyon National Park.  Like the Williams and Tusayan Ranger Districts, the North Kaibab Ranger District boasts diverse terrain and vegetation, as well as sensitive animal species.  Two federally listed endangered species—the Mexican spotted owl and California condor— live in the District, which the U.S. Fish and Wildlife Service has designated as critical habitat for the spotted owl.

## B.  The Travel Management Rule

In 2005, the U.S. Department of Agriculture promulgated a Travel Management Rule to "provide[] for a system of National Forest System roads, National Forest System trails, and areas on National Forest System lands that are designated for motor vehicle use."  36 C.F.R. § 212.50(a).[1]  As part of this system, "[d]esignated roads, trails, and areas [are] identified on a motor vehicle map," which also "specif[ies] the classes of vehicles" and "the

---

[1] The Rule's antecedents include executive orders issued by Presidents Nixon and Carter that sought to limit the damage to federal public lands caused by off-road vehicles.  *See Utah Shared Access All. v. Carpenter*, 463 F.3d 1125, 1129–30 (10th Cir. 2006).

times of year for which use is designated." *Id.* § 212.56. Motor vehicle use is prohibited on roads not so designated. *Id.* § 212.50(a). The regulations include a specific provision concerning the use of motor vehicles for dispersed camping and big game retrieval, which allows that

> in designating routes, the responsible official may include in the designation the limited use of motor vehicles within a specified distance of certain forest roads or trails where motor vehicle use is allowed, and if appropriate within specified time periods, solely for the purposes of dispersed camping or retrieval of a downed big game animal by an individual who has legally taken that animal.

*Id.* § 212.51(b).

The Forest Service's Southwestern Regional Office issued guidelines for implementation of the Travel Management Rule, including its motorized big game retrieval provision. The guidelines noted that "National Forests in the Southwestern Region provide hunting opportunities that are important to the public," and directed forests to identify designated routes for game retrieval "in close collaboration with the responsible State agency." They also suggested, pursuant to discussions with the Arizona Game and Fish Department, that motorized big game retrieval be allowed "up to three miles from a designated route" for bison and "up to one mile from a designated route" for elk and mule deer.

The Forest Service crafted travel management plans for each of the three Ranger Districts in the Kaibab National Forest.  It also prepared an Environmental Assessment (EA) for each plan to ascertain its environmental impact, but did not undertake a more rigorous Environmental Impact Statement (EIS).

### i.    The Williams Ranger District

In July 2010, the Forest Service released the EA for the Williams Ranger District's travel management plan, and subsequently issued a Decision Notice and Finding of No Significant Impact (DN/FONSI).  The DN/FONSI generally "prohibit[s] motorized travel off of designated routes on the Williams Ranger District," but permits "the limited use of motor vehicles within one mile of all designated system roads (except where prohibited) to retrieve a legally hunted and tagged elk during all elk hunting seasons."  It allows motorized big game retrieval of elk (but not bison) up to one mile off all designated open roads, so long as hunters make only "[o]ne trip that uses [the] most direct route and least ground disturbing."   The designated open road system consists of 1,114 miles of roadway, a reduction from previous motor vehicle activity, when 1,460 miles of roads and 95 percent of the District were open to motor vehicle use.  Several miles of the open roads pass through the spotted owl critical habitat.

### ii.    The Tusayan Ranger District

Previously, the Tusayan Ranger District contained more than 700 miles of roads open to motor vehicles, and a vast majority of the District was open to cross-country motor vehicle travel.  The Forest Service's final DN/FONSI for the

District[2] designated 566 miles of road open to motor vehicles. The decision permits "[l]egally harvested elk [to] be retrieved during all legal elk hunting seasons" by motor vehicles within one mile of designated roads. Motorized retrieval of bison is not permitted, and the DN/FONSI limits use of motor vehicles when "conditions are such that travel would cause damage to natural and/or cultural resources," and mandated that "[m]otorized vehicles would not be permitted to cross riparian areas, streams and rivers except at hardened crossings or crossings with existing culverts."

### iii. The North Kaibab Ranger District

Prior to implementation of a new travel management plan, 1,852 miles of road in the North Kaibab Ranger District were open to motor vehicle use, with 83 percent of the District open to cross-county travel. In September 2012, the Forest Service released an EA analyzing the District's new plan. Among other data, the EA noted that while "[c]ross-country motorized travel, whether to retrieve game or for other purposes, can adversely affect cultural resource sites if a vehicle is driven across a site," only thirty-eight bison and no elk were taken from the District in 2009.

The Forest Service issued a DN/FONSI that designated 1,476 miles of open roads for motorized travel, including an additional 16 miles of unauthorized, user-created roads. Motor vehicles can be used to retrieve elk or bison during hunting seasons, under certain limiting conditions. Notably,

---

[2] In April 2009, the Forest Service issued an initial EA that analyzed the impact of the new travel management plan, as well as a subsequent DN/FONSI. In response to administrative appeals, that decision was reversed, and a new environmental survey undertaken. The resulting EA, issued in January 2011, reflected additional analysis and public comment.

the plan prohibits motorized retrieval of mule deer; the data indicated that far more mule deer—1,020—were harvested in the District in 2009 than bison or elk.  The DN/FONSI also included guidance for monitoring and mitigation, as well as practices to limit the spread of invasive exotic weeds.

## II.  Procedural Background

The Districts' travel management plans—their motorized big game retrieval provisions in particular—were administratively appealed, and the Regional Forester upheld them.

Plaintiffs then filed a complaint for declaratory and injunctive relief in the district court.  They challenged the travel management plans for each of the three Ranger Districts, alleging violations of the Travel Management Rule, the Administrative Procedure Act (APA), NEPA, and the NHPA.  After the parties filed and briefed cross-motions for summary judgment, the district court granted the Forest Service's motion and denied Plaintiffs' motion.  It further denied the motions for summary judgment filed by Intervenors-Defendants-Appellees State of Arizona (the State) and Safari Club International (Safari Club) as moot. This timely appeal followed.

## STANDARD OF REVIEW AND JURISDICTION

We review de novo a district court's order granting or denying a motion for summary judgment. *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001).  Under the APA, agency action can be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A); *see also WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 932 (9th Cir. 2015) (Travel Management Rule reviewed

under the APA); *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005) (NHPA challenge reviewed under the APA); *Churchill County*, 276 F.3d at 1071 (NEPA challenge reviewed under the APA).

We have jurisdiction pursuant to 28 U.S.C. § 1291.

## ANALYSIS

### I.  The Travel Management Rule

Plaintiffs argue that the Forest Service violated the Travel Management Rule by implementing plans that did not sufficiently limit motorized big game retrieval in the Districts.

Although the Travel Management Rule generally prohibits off-road, motorized travel, it permits officials to designate "the *limited* use of motor vehicles within a specified distance of *certain* forest roads . . . solely for the purposes of dispersed camping or retrieval of a downed big game animal." 36 C.F.R. § 212.51(b) (emphases added).  As part of this designation process, the Forest Service must consider various criteria, ranging from "public safety" and "conflicts among uses of National Forest System lands" to "[d]amage to soil, watershed, vegetation, and other forest resources" and "[h]arassment of wildlife and significant disruption of wildlife habitats."  36 C.F.R. § 212.55(a)–(b). Compliance with these "minimization criteria" is mandatory.  *Mont. Snowmobile*, 790 F.3d at 929–32.

Plaintiffs contend that the Forest Service violated the Travel Management Rule by permitting off-road motorized vehicle use to collect downed game within one mile of every open road in the Districts, in purported violation of the

Rule's mandate that such activity be "limited" and only on "certain" roads.  We disagree.

## A.  "Limited"

First, Plaintiffs argue that "designating cross-country off-road motor vehicle use for one mile off both sides of every single open road on each Ranger District is not a 'limited' designation as contemplated by the Travel Management Rule."  They note that the Forest Service's own regional office acknowledged as much when reviewing the North Kaibab Ranger District's plan proposal; the office commented, "Motorized [big game retrieval] is being proposed on all system routes which is not consistent with rule for 'limited use.'"  The assistant NEPA coordinator of that District also questioned the scope of the plan, noting, "What I don't see is how this got you to your proposed actions, particularly the [motorized big game retrieval] on ALL roads with 1 mile corridor . . . . that's huge."  In their brief, Plaintiffs include maps prepared by the Forest Service, which illustrate the extent of areas (in light blue) where motorized big game retrieval is allowed in the Tusayan and Williams Ranger Districts.  These maps indicate, as Plaintiffs argue, that the plans permit motorized big game retrieval across a vast swath of the Districts' lands:





As the district court correctly noted, however, Plaintiffs' focus on only the *spatial* limitation of the Districts' plans ignores the other restrictions on motorized big game retrieval. The North Kaibab Ranger District plan illustrates some of these additional limitations: restricting retrieval to legally hunted elk and bison[3]; permitting only one vehicle per harvested animal; requiring hunters to "use the most direct and least ground disturbing route in and out of the area to accomplish the retrieval"; and limiting the temporal period to the "appropriate season as designated by the [State], and for 24 hours following each season." The Williams and Tusayan Ranger Districts further exclude the retrieval of bison and require motor vehicles to cross streams and rivers only at designated crossings. We agree with the district court that "these limitations are a significant departure from the previous policy which did not limit the number of trips . . . , did not limit the type of species which could be retrieved by motor vehicle, did not limit the distance traveled from system roads, and had no restrictions on seasons or weather conditions and no requirement for use of a direct route."

Plaintiffs assert that "the nearly unlimited spatial allowance . . . in and of itself[] violates the plain terms of the Travel Management Rule," but provide no authority for that proposition. Because we find no support for it in either case law or the applicable regulations, we conclude that the Forest Service did not abuse its discretion when it authorized plans that limit motorized big game retrieval based on factors other than geography. *See* 5 U.S.C. § 706(2)(A).

---

[3] The State notes that additional, non-qualifying big game species can also be found in the Kaibab National Forest, including mule deer, pronghorn, and black bears.

As for the regional office's skepticism regarding the scope of retrieval permitted under the plans, "the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious," as agencies are "fully entitled" to "change[] their minds . . . as long as the proper procedures were followed." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007). Such apparent inconsistencies might serve as evidence of arbitrariness or capriciousness, *see Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1134 (9th Cir. 2011) (noting that *Home Builders* "did not hold, however, that such preliminary determinations are irrelevant in any context"), but absent other evidence that the plans violated the Travel Management Rule, we do not find these comments particularly enlightening, especially since the Regional Forester ultimately upheld the designation decisions as to each Ranger District.**[4]**

Ultimately, as the district court concluded, "Plaintiffs have only identified dissatisfaction with the ultimate decisions made by the Forest Service in authorizing [motorized big game retrieval] in the three ranger districts." Although it is not unreasonable to interpret "limited use" spatially, Plaintiffs point to no statute, regulation, or ruling that *requires* a geographic limitation of this sort. The Districts' plans limit motorized big game retrieval as to timing, qualified species, and number of vehicles, which is

---

**[4]** The same can be said for any inconsistencies between the final plans and the guidance provided by the Forest Service's regional officer, to which Plaintiffs point as evidence that the Rule was violated. Although, for example, the guidance suggested that retrieval of elk not be allowed "between one hour before sunrise and 10:00 am," that limitation was not a *requirement*, but merely a *recommendation*, and so a failure to implement it does not render the plans unlawful.

both a reasonable interpretation of the Rule and an indication that the Forest Service both considered and applied the mandatory minimization criteria. *See Mont. Snowmobile*, 790 F.3d at 932. Given that much of the Districts' land was open to cross-country motorized travel prior to implementation of the plans, we conclude that the new restrictions constitute a "limited" use of motorized vehicles.

## B. "Certain"

Next, the Rule allows motorized retrieval on "certain forest roads." 36 C.F.R. § 212.51(b). Plaintiffs argue that the word "certain" requires that it only be allowed on "some, but not all" roads. Because the plans permit retrieval within one mile of *all* designated roads, Plaintiffs conclude that they are unlawful. The Forest Service, however, correctly notes that while the word "certain" can mean "some, but not all," the more common definition of the term is "definite" or "fixed." *See, e.g.*, *Webster's Third New International Dictionary* 367 (2002) (listing the primary definitions of "certain" as "fixed, settled, stated" and "exact, precise").

Because the Forest Service limited motor vehicle use to a defined set of roads in each District, it complied with the Rule. Even if the proper interpretation of the word "certain" were ambiguous, the Forest Service's definition of "fixed" or "definite" is permissible, consistent with the text of the Rule, and entitled to deference. *See Home Builders*, 551 U.S. at 672 ("An agency's interpretation of the meaning of its own regulations is entitled to deference 'unless plainly erroneous or inconsistent with the regulation.'" (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997))).

## C. "Sparingly"

Lastly, Plaintiffs contend that the Forest Service failed to implement motorized big game retrieval "sparingly." Travel Management; Designated Routes and Areas for Motor Vehicle Use, 70 Fed. Reg. 68,264, 68,285 (Nov. 9, 2005) ("The Department expects the Forest Service to apply this provision *sparingly*, on a local or State-wide basis, to avoid undermining the purposes of the final rule and to promote consistency in implementation." (emphasis added)). They argue that "allowing motorized big game retrieval off of every single open road is not using [the Forest Service's] authority sparingly," and that the Forest Service erroneously concluded that the plans were sparing and limited because they permitted less motorized retrieval than under the prior policies that imposed no restrictions.

This argument is unpersuasive. First, the word "sparingly" does not appear in the Rule, but instead in its preamble. We look to a preamble only when the regulation itself is ambiguous. *El Comité para el Bienstar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1070 (9th Cir. 2008). Accordingly, as the Forest Service correctly asserts, the preamble does not "impose a duty above and beyond the actual terms of the regulation."

Moreover, Plaintiffs' argument fails for much the same reason as their "limited" argument above: it relies on a strictly spatial conception of "sparingly," while ignoring the other restrictions that the plans impose on motorized big game retrieval. Absent authority requiring a strictly geographic interpretation of the words "limited" and "sparingly," we conclude that the Forest Service did not violate the plain terms of the Travel Management Rule.

## II. NEPA

### A. Standing

As a preliminary matter, Safari Club challenges whether Plaintiffs have standing to bring their NEPA claims. It observes that Plaintiffs' "standing declarant, Kim Crumbo, revealed that his own activities in the forests cause the very same impact that [they] seek to attribute to motorized big game retrieval," since Crumbo recounted "incidents during which he, on his bicycle, interfered with young goshawk and a goshawk pursuing its prey." Accordingly, Safari Club suggests that Plaintiffs cannot satisfy the redressability requirement for standing, *see Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008), because Plaintiffs "themselves are a source of" the negative effects that they seek to analyze through an EIS, and so "[n]o change in process and no [EIS] analysis of motorized big game retrieval will prevent [Plaintiffs'] members from engaging in conduct that is the source of effects" that they seek to mitigate.

Under Safari Club's reasoning, a hypothetical plaintiff challenging an EPA decision on a $CO_2$-emitting power plant would lack standing just because she also happens to exhale carbon dioxide. This result would not only be absurd, but also contrary to our prior precedent, for we have held that

> the mere existence of multiple causes of an injury does not defeat redressability, particularly for a procedural injury. So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury.

*WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1157 (9th Cir. 2015).

Safari Club also challenges Plaintiffs' NEPA standing based on their perceived motivation for bringing suit. Asserting that Plaintiffs' "goal in bringing this action was to use NEPA and the NHPA to force [the Forest Service] to reverse [its] authorization of motorized big game retrieval," it contends that "NEPA does not provide a cause of action" and that Plaintiffs lack prudential standing. Regardless of Plaintiffs' motivation in commencing this suit, however, if a group is "trying to protect the environment," then its "suit [] lies well within NEPA's zone of interests." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 976 (9th Cir. 2003); *see also Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018). Accordingly, we conclude that Plaintiffs have standing to bring their NEPA claims.

## B. Legal Framework

NEPA requires federal agencies, including the Forest Service, to assess the environmental impact of proposed actions that "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). It

> serves two fundamental objectives. First, it "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." And, second, it requires "that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."

*Mont. Snowmobile*, 790 F.3d at 924 (citation omitted) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). In short, "NEPA's purpose is to ensure that 'the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'" *Friends of Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989)). We have admonished that "[w]e must . . . strictly interpret the procedural requirements in NEPA . . . 'to the fullest extent possible' consistent with the policies embodied in NEPA. '[G]rudging, pro forma compliance will not do.'" *Churchill County*, 276 F.3d at 1072 (fourth alteration in original) (citation omitted) (quoting *Lathan v. Brinegar*, 506 F.2d 677, 687, 693 (9th Cir. 1974) (en banc)). As part of this compliance, agencies must ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

The Forest Service must prepare an EIS—a more thorough undertaking than an EA[5]—if an action might significantly affect environmental quality. As we have explained,

---

[5] "Before deciding whether to complete an EIS, government agencies may prepare a less formal EA which 'briefly provides sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.'" *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004) (quoting *Tillamook County v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002)).

> An EIS must be prepared if "substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor."  Thus, to prevail on a claim that the Forest Service violated its statutory duty to prepare an EIS, a "plaintiff need not show that significant effects will in fact occur."  It is enough for the plaintiff to raise "substantial questions whether a project may have a significant effect" on the environment.

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (alteration in original) (citations omitted) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149–50 (9th Cir. 1998)); *see also Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) ("[A]n agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to 'supply a convincing statement of reasons why potential effects are insignificant.'" (quoting *Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir. 1985))).  The significance of an action depends on its context and intensity, the latter of which is assessed using a list of criteria enumerated in the relevant regulation.  *See* 40 C.F.R. § 1508.27(a)–(b).

## C. Whether the Forest Service Needed to Prepare EISs

Plaintiffs contend that "the presence of several significance factors indicating possible significant environmental consequences of the proposed actions" required the Forest Service to prepare EISs for each of the Districts' travel management plans.  We analyze in turn each consideration to which they point.

### i.  Impacts

The first enumerated consideration in evaluating an action's intensity concerns "[i]mpacts that may be both beneficial and adverse," and notes that "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial."  40 C.F.R. § 1508.27(b)(1). "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts."  *Id.* § 1508.27(b)(7).

Plaintiffs suggest that "the travel management plans for each Ranger District would have significant direct, indirect, and cumulative impacts," noting that both motorized vehicle use on open, designated roads *and* cross-country, off-road motorized vehicle use can have "significant detrimental effects . . . on a variety of resources."

The assertion that motorized big game retrieval can have detrimental effects on the environment is consistent with the information contained in the EAs prepared for the Williams and Tusayan Ranger Districts.  Those EAs noted that "[t]he scientific literature documents a variety of negative effects of roads and motorized travel on wildlife," with

> [p]otential direct and indirect effects of roads and motorized travel on wildlife includ[ing] habitat loss, fragmentation, and degradation caused by roads and cross country motorized travel; roads can create barriers to movements of certain species; animals can be killed or injured as a result of being hit or run over by motor vehicles; human disturbance or harassment of animals caused by or

> facilitated by motorized travel; [and] shooting or harvest of animals facilitated by motor vehicle access to wildlife habitats.

The Williams Ranger District EA further indicated that off-road vehicle use "in areas with sensitive or moist soils can create tracks, ruts and new user routes that may crush, displace, and/or destroy cultural materials (i.e. artifacts, features, traditionally used plants), and damage significant information that may contribute to our understanding of history." A particularly vexatious problem related to motorized vehicle use is the spread of invasive weeds. Each of the three EAs noted that vehicles are a common cause of weed introduction and spread, with the North Kaibab Ranger District EA reporting that "[t]he authorization of motorized big game retrieval will have an increased threat of invasive species spread as every vehicle that travels cross-country has the ability to serve as a vector and create disturbance."[6]

We do not disagree with Plaintiffs' assertion that motorized big game retrieval can have a negative effect on the environment. But we nevertheless conclude that the environmental impacts discussed in the EAs did not raise substantial concerns that necessitated the preparation of EISs. Plaintiffs might disagree with the Forest Service's *substantive* conclusions, but we see no indication that the agency failed to satisfy NEPA's *procedural* requirements— a crucial distinction that is lost in Plaintiffs' formulation of the issue.

---

[6] This is because, as explained in the Williams Ranger District EA, "[v]ehicles driving through populations of invasive plants often get seed[s] entrapped in tire tread or undercarriages, move to another area and then drop seeds into a previously uninfested area."

Plaintiffs' treatment of the spread of invasive weeds is illustrative. They tie the problem of weeds to another enumerated NEPA consideration that implicates "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." *Id.* § 1508.27(b)(3). They note that "both the North Kaibab and Tusayan Ranger Districts immediately abut Grand Canyon National Park." The EAs agreed: they described Grand Canyon National Park as "internationally important," and noted the Tusayan Ranger District's "unique location" as "a gateway to one of the most famous national parks in the country." In that District's EA, the Forest Service acknowledged that recreation and hunting—activities facilitated by the travel management plan—"have the potential to introduce exotic plants" that "may then spread to adjoining lands, including the Grand Canyon National Park." The National Park Service, in a letter from the Acting Park Superintendent of Grand Canyon National Park, advised the Forest Service to "institute a buffer zone of 1-mile along the park boundary for any purpose including big-game retrieval, fuel-wood gathering, cross-county travel, etc.," due to "increased pressure from motorized vehicles at or near the southern park boundary over the past several years"—a recommendation that was not adopted in the Tusayan Ranger District DN/FONSI.

Clearly, the EAs demonstrated that motorized big game retrieval risks the spread of invasive weeds, an undeniable environmental impact. In response, the Forest Service relies in part on questionable reasoning by focusing on the fact that the plans *reduced* negative impacts when compared with pre-plan activity. It notes that the plan eventually selected for the Tusayan Ranger District opted to limit the number of roads open to the public, which, the EA noted, "reduces the

number of opportunities for noxious and invasive exotic weeds to be introduced and spread." "Thus," the Forest Service concludes, "contrary to [Plaintiffs'] argument, the Tusayan EA confirms that the Forest Service considered the issue and reasonably concluded that the decision will reduce, not increase, the spread of exotic plants."

However, a conclusion, even a correct one, that a given action might reduce a potential impact does not alone indicate that the impact would not be significant. We have noted that the use of baselines is a helpful, and perhaps inevitable, tool in conducting environmental surveys. *See Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) ("The establishment of a 'baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action.'" (quoting *Am. Rivers v. FERC*, 201 F.3d 1186, 1195 n.15 (9th Cir. 1999))). But we have also determined that "simply because the Final Rule may be an improvement over the [previous] standard does not necessarily mean that it will not have a 'significant effect' on the environment" where the agency "has not explained *why* its rule will not have a significant effect." *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1224 (9th Cir. 2008). The plans chosen by the Forest Service might reduce (even substantially reduce) the spread of noxious weeds in the Districts, but that alone does not address whether that *reduced impact itself* has a significant impact on the environment generally and Grand Canyon National Park in particular. Therefore, the Forest Service cannot rely solely on the reduction of adverse impacts to demonstrate that those impacts are not significant.

But that the Forest Service occasionally conflates *reduction* with *insignificance* does not necessarily mean that it violated NEPA.  To demonstrate, we once again go into the weeds.

The Forest Service acknowledged that the North Kaibab Ranger District contained "several species of invasive weeds," which "are spread [] via roads and forest visitors." The plan that was eventually selected "reduce[d] the number of roads that can be traveled on by 376 miles," which, the EA found, would "lower the amount of invasive species seed introduced or spread."  But notably, the EA continued:

> The authorization of motorized big game retrieval will have an increased threat of invasive species spread as every vehicle that travels cross-country has the ability to serve as a vector and create disturbance. Alternative 2 [the selected plan] authorizes motorized big game retrieval for only elk and mule deer.  This is expected to lead to only a small increase in the potential for invasive species spread and disturbance when compared to Alternative 3 and should not generate any realistic impacts.

This passage demonstrates that the Forest Service did not merely rely on the possibility of reduction, but also concluded that the plan would "not generate any realistic impacts"; in other words, that the effects would not be significant.  Furthermore, as the district court noted, the EA mentioned that the North Kaibab Ranger District featured "projects focus[ed] on treating known infestations across the District, prioritizing the species and locations that pose the greatest threats," methods that had "proven successful in

eradicating or reducing potentially serious noxious species threats." This language indicates that the Forest Service acknowledged a potential environmental impact, and then determined that, due to features of the travel management plan and other remediation efforts, it was unlikely to be significant. Contrary to Plaintiffs' argument, the Forest Service did not merely determine that the problem would be reduced; it also concluded that the impact would not be significant. Plaintiffs disagree with the EA's conclusion, but this is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh*, 490 U.S. at 376. We agree with the district court: "Plaintiffs' singular and conclusory statement that exotic plants might spread . . . does not raise substantial questions that would trigger the need for an EIS."

Similarly, although the Forest Service did not follow all of the recommendations made by Grand Canyon National Park's Acting Park Superintendent, this fact does not mean that it ignored a significant environmental impact. Agencies can thoughtfully consider suggestions but ultimately decide to reject them, and the presence of an articulated concern does not alone trigger the need to conduct an EIS. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) ("NEPA permits a federal agency to disclose [] impacts without automatically triggering the 'substantial questions' threshold."). Here, the record indicates that the Forest Service explained why a buffer would not be employed ("We don't expect to use a buffer zone as many management actions will need to extend to the Forest Service-National Park boundary"), and further articulated means of remedying the risk of illegal motor vehicle use (such as "limit[ing] motorized big game retrieval during all elk seasons" and "work[ing] closely with Arizona Game and Fish Department to monitor and enforce illegal

cross-country travel associated with hunting activities"). We find no indication in the record that the Forest Service did not adequately consider potential impacts, or that substantial questions remained that required the preparation of an EIS.

The same conclusion ultimately applies to all of the environmental impacts that Plaintiffs highlight in their briefs: although Plaintiffs disagree with the EAs' factual conclusions, the Forest Service nonetheless considered the issues, gave them the requisite "hard look," and thus fulfilled their NEPA obligations. *Save the Yaak*, 840 F.2d at 717. In reaching its conclusions that none of the impacts cited by Plaintiffs were sufficiently significant to require the preparation of EISs, the Forest Service did not "rel[y] on factors Congress did not intend it to consider, 'entirely fail[] to consider an important aspect of the problem,' or offer[] an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1157 (9th Cir. 2006)), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). Instead, the evidence in the record indicates that, although the EAs acknowledged that motorized big game retrieval might have negative impacts on the environment, the Forest Service's determination that these impacts would not be significant evinced "a rational connection between the facts found and the conclusions made." *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). Therefore, its conclusions were not arbitrary and capricious, and the Forest Service did not violate NEPA by declining to prepare EISs based on the plans' environmental impacts.

### ii.  Controversy and Uncertainty

NEPA also requires the preparation of an EIS when an action's "effects on the quality of the human environment are likely to be highly controversial," and/or "are highly uncertain or involve unique or unknown risks."  40 C.F.R. § 1508.27(b)(4)–(5).  "A project is 'highly controversial' if there is a '"*substantial dispute* [about] the size, nature, or effect of the major Federal action *rather than the existence of opposition to a use*."'"  *Native Ecosystems Council*, 428 F.3d at 1240 (alteration in original) (emphases added) (quoting *Blue Mountains*, 161 F.3d at 1212); *see also Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1122 (9th Cir. 2000) ("The existence of opposition to a use, however, does not render an action controversial."), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).  "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI casts serious doubt upon the reasonableness of an agency's conclusions."  *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001) (citation omitted), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).  Additionally, because "[a]n agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain," such preparation "is mandated 'where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent speculation on potential . . . effects.'"  *Barnes*, 655 F.3d at 1140 (second alteration in original) (quoting *Native Ecosystems Council*, 428 F.3d at 1240).  However, NEPA regulations "do not anticipate the need for an EIS anytime there is *some* uncertainty, but only if the effects of the project are 'highly' uncertain."  *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1011 (9th Cir. 2006).

Plaintiffs contend that "the travel management plans for the Tusayan, Williams, and North Kaibab Ranger Districts present highly controversial and highly uncertain effects that involve unique or unknown risks," because "significant controversy exists as to the amount and type of motorized recreation that would be allowed across the three Ranger Districts." But Plaintiffs point to nothing in the record indicating the existence of a *substantial* dispute that casts doubt on the Forest Service's conclusions about environmental impacts. There may have been opposition to the plans, but mere opposition alone is insufficient to support a finding of controversy. The Forest Service "recognize[d] that elements of the Selected Alternative [] generated controversy," but concluded—apparently correctly—that there was "no substantiated scientific controversy over the effects as described."

Plaintiffs assert that various questions raised during the EA process revealed a high level of scientific uncertainty, but the record belies that assertion. For example, as to the potential risks "based on the broad allowance of motorized big game retrieval," the Forest Service attempted to estimate hunting activity based on past data, and used this information to conclude that the impacts of motorized big game retrieval would be limited. Plaintiffs identity nothing in the record to suggest that the Forest Service's estimates were unduly speculative, or that it unreasonably relied upon these predictions. Plaintiffs also argue that there was "uncertainty regarding whether or not hunters will actually remove gut piles" when retrieving carcasses, which they must do "to protect California condors from lead poisoning." But although the Forest Service acknowledged that this issue might present a problem, the record also indicates that it considered the issue and reasonably concluded that it was unlikely to significantly impact the North Kaibab Ranger

District's condors because the Arizona Game and Fish Department had provided to hunters, among other incentives, lead-free ammunition. The Forest Service also noted that "there would be decreased risk of human disturbance of scavenging condors as a result of a reduced open road system and substantially restricted motorized cross-country travel," and concluded that the North Kaibab Ranger District plan "is *not likely to jeopardize the continued existence* [of] California condors." Plaintiffs neither challenge nor address these conclusions, and instead rely on the mere existence of potential problems as evidence of significant uncertainty—a tactic that does not pass muster. *See Native Ecosystems Council*, 428 F.3d at 1240 ("Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or highly uncertain.").

### iii.  Precedent for Future Actions

Another consideration for measuring an action's intensity for NEPA purposes is "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration."  40 C.F.R. § 1508.27(b)(6). Although "EAs are usually highly specific to the project and the locale, thus creating no binding precedent," *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1071 (9th Cir. 2014) (quoting *Barnes*, 655 F.3d at 1140), and the Forest Service here explicitly found that each of the three travel management plans was "not likely to establish a precedent for future actions with significant effects," Plaintiffs assert that this consideration is nonetheless implicated because "the Forest Service has [] made public statements indicating

that what the Kaibab National Forest does, so too will other southwestern National Forests."

It is true that the record contains evidence to this effect—including that the Coconino National Forest "will defer to the neighboring Kaibab National Forest's policy for [motorized big game retrieval] in units shared with the Williams Ranger District, regardless of how the Coconino proposes to apply the Travel Management Rule," and that the Prescott National Forest will "match them as best as we can"—but that does not mean that the Districts' plans bind or necessarily shape other forests' plans in such a way that they should be considered precedential, especially since any other forest's plan would be subject to its own NEPA analysis. *Cf. Sierra Club v. Marsh*, 769 F.2d 868, 879 (1st Cir. 1985) (determining that an action was precedential because "once Maine completes the causeway and port, pressure to develop the rest of the island could well prove irreversible"). In *Oregon Wild v. Bureau of Land Management*, a district court dealt with a similar situation, where a project was "part of a larger series of 'pilot projects' aimed at 'inform[ing] long-term planning' for management of [] lands in Oregon and California." No. 6:14-CV-0110-AA, 2015 WL 1190131, at *9 (D. Or. Mar. 14, 2015) (first alteration in original). There, as here, the most that could be concluded from such a minor precedential effect is that this consideration "supports the conclusion that an EIS is necessary"—but "the precedential factor alone is not dispositive." *Id.*; *see also Anderson v. Evans*, 371 F.3d 475, 493 (9th Cir. 2004) (finding this factor "insufficient on its own to demonstrate a significant environmental impact" where an action is merely influential and not binding). Thus, this consideration alone did not require preparation of an EIS.

### iv.  Threatened Species

Finally, there is the issue of the Mexican spotted owl, a threatened species found in the Williams and North Kaibab Ranger Districts.  The Forest Service must consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973."  40 C.F.R. § 1508.27(b)(9).  Plaintiffs point to portions of the record that raise the specter of adverse effects—including consultation letters between the Williams and North Kaibab Ranger Districts and the U.S. Fish and Wildlife Service regarding the owls—but they again ignore the Forest Service's overall conclusions.  For example, the Williams Ranger District EA reported that some roads would pass through Mexican spotted owl critical habitats, which might result in "increased potential human disturbance." But the EA ultimately concluded that the selected plan would be "primarily beneficial," and would "not adversely affect Mexican spotted owl or Mexican spotted owl designated Critical Habitat."   In a separate biological assessment, the Forest Service concluded that "[t]he effects determination for Mexican spotted owl and Mexican spotted owl critical habitat is *may affect, not likely to adversely affect*," based on the

> determination [] that potential effects of the proposed action on the Mexican spotted owl would be primarily beneficial.  Closing roads and restricting motorized cross-country travel under the proposed action would result in reduced motorized access to spotted owl habitat compared to current management and thus reduced risk of human disturbance to spotted owls, reduced impacts to habitat of

spotted owls and their small mammal prey
species, and reduced impacts to designated
critical habitat.

Notably, the U.S. Fish and Wildlife Service concurred in this
determination.

In short, although the Forest Service did not definitively
conclude that no Mexican spotted owls would be adversely
affected by the Districts' travel management plans, the
record indicates that they sufficiently considered the issue
and arrived at a reasonable conclusion that the effects would
not be significant, thus obviating the need for an EIS.

### v.  Summation

In the end, we conclude that the Forest Service's
determination that no EISs were needed as to the Districts'
travel management plans was reasonable.  The plans might
have some precedential effect, there is a possibility that
Mexican spotted owls might be affected, and exotic weeds
might be spread by motorized big game retrieval, but the
record ultimately supports the Forest Service's conclusion
that these concerns do not rise to the level of significance
that would require EISs.  The Forest Service gave the
requisite hard look and made determinations that were
neither arbitrary nor capricious, and were consistent with the
evidence before it.  Absent substantial questions that would
have mandated EISs, the Forest Service did not violate
NEPA.[7]

---

[7] Two other enumerated considerations are relevant in this case:
"[t]he degree to which the action may adversely affect . . . objects listed
in or eligible for listing in the National Register of Historic Places or may

## III.    NHPA

Finally, Plaintiffs contend that the Forest Service violated the NHPA by failing to identify and evaluate the "high density of cultural resources" that might be damaged as a result of motorized travel in the Districts.

The NHPA's purpose is to "foster conditions under which our modern society and our historic property can exist in productive harmony," 54 U.S.C. § 300101(1), and it requires federal agencies to "make a reasonable and good faith effort" to identify historic properties that might be affected by an action, and to "take [those potential effects] into account." 36 C.F.R. § 800.4(b)(1); *see also* 54 U.S.C. § 306108.[8]  "Like NEPA, '[s]ection 106 of NHPA is a "stop, look, and listen" provision that requires each federal agency to consider the effects of its programs.'" *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592,

---

cause loss or destruction of significant scientific, cultural, or historical resources," and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(8), (10).  However, the former consideration essentially depends on whether the Forest Service complied with the NHPA, while the latter hinges on the Forest Service's compliance with both the NHPA and the Travel Management Rule. Because we conclude that the Forest Service complied with both, we also conclude that no federal laws were violated, and no cultural resources adversely affected, such that EISs were required based on these considerations.

[8] "Historic property means any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior." 36 C.F.R. § 800.16(l)(1).

607 (9th Cir. 2010) (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999)).

Plaintiffs assert that the Forest Service violated the NHPA in three ways: (1) by failing "to make a reasonable and good faith effort to identify and evaluate cultural properties"; (2) by "erroneously determin[ing] that 'Exemption Q' excuses NHPA consultation for the Tusayan and Williams Ranger Districts"; and (3) by arbitrarily making "a 'no adverse effect' determination for the North Kaibab Ranger District after admitting that cross-country travel damages cultural resources." We consider each argument in turn.

## A.  Identification of Cultural Properties

Section 106 of the NHPA requires the Forest Service to "make a reasonable and good faith effort to identify historic properties; determine whether identified properties are eligible for listing on the National Register . . .; [and] assess the effects of the undertaking on any eligible historic properties found." *Te-Moak Tribe*, 608 F.3d at 607 (first alteration in original) (quoting *Muckleshoot Indian Tribe*, 177 F.3d at 805). It must also engage in consultation with the State Historic Preservation Officer (SHPO) to "[d]etermine and document the area of potential effects," "[g]ather information," and "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." 36 C.F.R. §§ 800.4(a), 800.6(a).

Plaintiffs principally argue that the Forest Service failed to "make a reasonable and good faith effort" because it did not complete 100 percent surveys of potentially affected areas. The First Amended Programmatic Agreement Regarding Historic Property Protection and Responsibilities

(Programmatic Agreement), which the parties agree provided the relevant guidelines, mandated that "[t]he level of need and extent of new field surveys or inspections will be proposed by a Professional Cultural Resource Specialist and approved by the Forest Archaeologist based on the guidelines provided in this section."  Those guidelines included the use of "relevant information to assess the potential to affect historic properties and the expected nature and distribution of heritage properties that may be affected"; namely, "[t]he expected nature and severity of all associated impacts" and "[t]he expected nature and distribution of heritage resources."  Based on the results of this "prefield research," the Resource Specialist and Forest Archeologist were directed to "determine the relative level of field survey to be conducted."  The Programmatic Agreement called for "100% surveys" where "site density is expected to be high" and where "site densities are unknown and expected visitor use or impacts will be high."  By contrast, "areas may be surveyed at less than 100%" where "known site density is low."

Here, the record supports the Forest Service's conclusion that the Programmatic Agreement did not require 100 percent surveys.  At the time the travel management plans were decided, the Forest Service had surveyed 42 percent of the Williams Ranger District, 23 percent of the Tusayan Ranger District, and 25 percent of the North Kaibab Ranger District.  It concluded that no further surveying was required, based on the expected density of cultural resources and the nature and severity of impacts upon them.

The record reinforces the determination that the expected impacts of the travel management plans would be low.  After considering historic hunting data, the EAs concluded that less than 0.1 percent of each District's acreage would be

impacted by motorized big game retrieval. However, the fact that "[t]he expected nature and severity of all associated impacts" might have been low does not necessarily mean that the Forest Service did not need to conduct 100 percent surveys, for the Programmatic Agreement required 100 percent surveys for high-density sites regardless of impact level. Accordingly, the Forest Service's obligation rested on "[t]he expected nature and distribution of heritage resources."

The record is somewhat unclear as to the density of heritage resources in the areas open to motorized big game retrieval. Plaintiffs note that many of the Districts' cultural resources are close to the roads, but that does not necessarily speak to the *density* of resources because the Programmatic Agreement does not provide any benchmark or guidance as to what constitutes a high-density site. Ultimately, the lack of clarity weighs in the Forest Service's favor: it was not unreasonable for it to determine that the density was low or unknown, either of which would have excused 100 percent surveys.[9] Thus, the Forest Service followed a reasonable interpretation of the Programmatic Agreement.

## B.  Exemption Q

The Programmatic Agreement's Exemption Q provided that "[a]ctivities not involving ground or surface disturbance (e.g., timber stand improvement and precommercial thinning by hand)" are "exempt from further review and consultation." Plaintiffs argue that the Forest Service

_____

[9] The Programmatic Agreement required 100 percent surveys "where site densities are unknown and expected visitor use or impacts will be high," so it would have been reasonable for the Forest Service to conclude that 100 percent surveys were not needed where densities were unknown and use impacts were low.

arbitrarily relied on Exemption Q to excuse review of motorized big game retrieval in the Williams and Tusayan Ranger Districts.

Once again, however, the record does not support Plaintiffs' assertions. We agree with Plaintiffs that invoking Exemption Q would have been inappropriate here. It is clear, and the Forest Service does not dispute, that motorized travel causes surface disturbance. But although the Forest Service's correspondence with non-party Center for Biological Diversity *suggested* that it applied Exemption Q,[10] the record as a whole supports a contrary conclusion. The Forest Service consulted with both the Arizona SHPO and potentially affected tribes as to each District's travel management plan—consultations that would not have been required if Exemption Q had been applied. Moreover, the Forest Service made no other references to Exemption Q as part of the travel management plan decision process, which further supports the conclusion that it was not in fact invoked. Accordingly, the references to Exemption Q at

---

[10] The Forest Service claims that Plaintiffs' "brief does not identify where or how the Tusayan and Williams decisions purportedly relied on Exemption Q," and that their "responses to the non-party Center for Biological Diversity's administrative appeals of those decisions" contain only "an isolated reference to Exemption Q," but these assertions are misleading. In its response to the appeal regarding the Tusayan Ranger District, the Forest Service wrote that it "determined that motorized big game retrieval fell under Exemption Q of the PA, '*Activities not involving ground or surface disturbance (e.g., timber stand improvement and precommercial thinning by hand)*' and would have limited impacts similar to the examples cited in the exemption in the" Programmatic Agreement. That is more than a mere "isolated reference," as it implies that the Forest Service actually *applied* Exemption Q to the Tusayan Ranger District. This same language invoking Exemption Q appeared in the Forest Service's response regarding the Williams Ranger District.

most amounted to harmless error, as they had no effect on the NHPA consultation process.  *See* 5 U.S.C. § 706 (requiring the court to take "due account . . . of the rule of prejudicial error" when conducting APA review); *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 880 (9th Cir. 2009) ("We have held that the harmless error doctrine 'may be employed only "when a mistake of the administrative body is one that *clearly had no bearing* on the procedure used or the substance of decision reached."'" (quoting *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1071 (9th Cir. 2004))).**[11]**

### C.  "No Adverse Effect" Determination

Finally, Plaintiffs argue that the Forest Service's conclusion that motorized big game retrieval would have no adverse effect on cultural resources was arbitrary.  But to buttress this assertion, Plaintiffs again cherry pick isolated segments from the record without considering their broader context.  For example, the Cultural Resources Specialist Report prepared for the North Kaibab Ranger District noted that "[c]ross country motorized travel, whether to retrieve game or for other purposes, can adversely affect cultural resource sites if a vehicle is driven across a site," since "[v]ehicles can [] crush or displace artifacts and features

---

**[11]** Curiously, although the Forest Service similarly argued in the district court that "the agency's decisions did not rely on Exemption Q," we note that the court concluded that Exemption Q *did* apply.  On appeal, the Forest Service does not argue that the district court's conclusion on this point was correct, and we can affirm the court's ruling even though we agree with the parties that Exemption Q was not in fact applicable. *See Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 892 (9th Cir. 2019) ("We will affirm the district court's correct legal results, even if reached for the wrong reasons." (quoting *Alcaraz v. Block*, 746 F.2d 593, 602 (9th Cir. 1984))).

impacting the physical integrity of the site and impairing or destroying scientific information that may contribute to the understanding of the history and prehistory of an area." But that same report also concluded as follows:

> Quantifying the potential for damage from big game retrieval is difficult. The results vary depending on the number of game retrieval trips annually, the location of those retrievals (high site probability areas versus low probability), site types found in the area, soil characteristics, routes used to access the game and weather conditions at the time of retrieval. However, the fewer number of motorized trips that occur, the lower the likelihood of encountering and impacting a site. . . .

> *Limiting cross-country travel will have a beneficial effect on cultural resources by reducing the potential for sites to be damaged.* This alternative would restrict motorized big game retrieval to elk and bison. In 2009, 38 buffalo and no elk were taken . . . . While there is a possibility that cross-country game retrieval of either of these species could impact a cultural resource site, given the low number of takes each year, it is anticipated that the potential for adverse effects to a site would be negligible: 38 entries per year equates to less than .0099% of the acreage on the NKRD. *The odds of adversely affecting a cultural resource site under these conditions are extremely low.*

(emphases added).  In light of this ultimate conclusion, as well as the implementation of the suggested mitigation measures, it was not arbitrary for the Forest Service to conclude, based on the evidence before it, that adverse effects were unlikely.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency . . . offered an explanation for its decision that runs counter to the evidence before the agency.").

## D.  Summation

The NHPA—and NEPA—"create obligations that are chiefly procedural in nature."  *San Carlos Apache Tribe*, 417 F.3d at 1097 (quoting *Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982)).  Even if cultural resources might be harmed as a result of motorized big game retrieval, that fact alone does not indicate that the Forest Service violated the NHPA.  The Forest Service conducted the required prefield work, consulted with the appropriate entities, and reached a determination consistent with the evidence before it—in short, satisfied its procedural obligations.

## CONCLUSION

The travel management plans that the Forest Service implemented in the three Ranger Districts of the Kaibab National Forest limited motorized big game retrieval to certain roads and imposed additional restrictions to reduce the level and effect of motorized activity.  In crafting the plans, the Forest Service investigated potential impacts on both the environment and historic properties and reasonably determined that no further action was needed.  Accordingly, we conclude that the Forest Service followed the Travel

Management Rule and fulfilled its procedural obligations under NEPA and the NHPA.[12]

**AFFIRMED.**

---

[12] Amicus Curiae Rocky Mountain Elk Foundation filed a motion for leave to file an amicus brief in support of the Forest Service. We conclude that the proposed brief provides neither legal nor factual support to help resolve the issues on appeal, and so deny the motion.