**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

WILLIE H. GOFFNEY, JR., M.D.;
ADVANCED SURGICAL ASSOCIATES
MEDICAL OFFICE, INC., a California
corporation,

*Plaintiffs-Appellants*,

v.

XAVIER BECERRA, Secretary of the
United States Department of Health
and Human Services, in his official
capacity,

*Defendant-Appellee.*

No. 19-56368

D.C. No.
2:17-cv-08032-
MRW

OPINION

Appeal from the United States District Court
for the Central District of California
Michael R. Wilner, Magistrate Judge, Presiding

Argued and Submitted March 2, 2021
Pasadena, California

Filed April 29, 2021

Before:  Susan P. Graber, Stephen A. Higginson,[*] and
Eric D. Miller, Circuit Judges.

Opinion by Judge Miller

## SUMMARY[**]

### Medicare

The panel affirmed the district court's summary judgment entered in favor of the Secretary of Health and Human Services ("HHS") in an action challenging HHS's denial of plaintiff Dr. Willie Goffney's claim for reimbursement from the Medicare program for services that he provided covered patients.

In 2012, Dr. Goffney was informed that his Medicare billing privileges had been deactivated in 2008. In 2015, Dr. Goffney attempted to reactivate his billing privileges. The Medicare contractor in his region, Nordian Healthcare Solutions, approved Dr. Goffney's request, but assigned him a new effective date of August 31, 2015 – the date on which he submitted the forms to reactivate his billing privileges. That effective date precluded Dr. Goffney from obtaining compensation for services he had performed in the preceding decade. The HHS Departmental Appeals Board affirmed the agency's denial of Dr. Goffney's petition for review, and

---

[*] The Honorable Stephen A. Higginson, United States Circuit Judge for the U.S. Court of Appeals for the Fifth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

concluded that Dr. Goffney had filed a qualifying "enrollment application" and that the effective-date provision of 42 C.F.R. § 424.520(d) controlled.

The panel held that 42 C.F.R. § 424.520(d) was ambiguous, and did not specify whether a certification submitted to reactivate billing privileges constituted a "Medicare enrollment application" that triggered a new effective date. Specifically, the panel held that the parties' readings of other provisions of the regulations did not clearly resolve the ambiguity. The panel held that Section 424.555(b) supported the government's interpretation of "Medicare enrollment application" in this context. The panel further held that the regulatory history was not illuminating, and that considerations of purpose did not meaningfully affect its analysis.

The panel applied the principles of *Auer* deference to the agency's interpretation of its own regulations, and concluded that the interpretation reflected in the Departmental Appeals Board decision qualified for deference under *Auer*. Namely, section 424.520(d) was "genuinely ambiguous" in this context; the agency's reading fell within the permissible zone of ambiguity; and the agency's reading met all three of the additional criteria identified in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). First, the Board's interpretation represented an authoritative statement of the agency. Second, the ambiguity implicated the agency's core expertise because it involved the administration of the Medicare program. Third, the agency's reading was consistent with how it had previously interpreted the relevant regulations. The panel concluded that under the agency's interpretation of section 424.520(d), Dr. Goffney's reactivation request was "a Medicare enrollment application" and its filing date of

August 31, 2015 was the effective billing date of his billing privileges.

The panel held that the district court did not abuse its discretion in denying Dr. Goffney's motion to order HHS to supplement the administrative record.

## COUNSEL

Charles G. Smith (argued) and Dana M. Silva, Law Offices of Charles G. Smith, Sherman Oaks, California, for Plaintiffs-Appellants.

Daniel Aguilar (argued) and Mark B. Stern, Appellate Staff; Nicola T. Hanna, United States Attorney; Civil Division, United States Department of Justice, Washington, D.C.; for Defendant-Appellee.

## OPINION

MILLER, Circuit Judge:

Dr. Willie Goffney sought reimbursement from the Medicare program for services that he provided to covered patients. Applying its interpretation of the governing regulation, the Department of Health and Human Services (HHS) denied his claim. The Supreme Court recently reaffirmed that a reviewing court should defer to an agency's reasonable interpretation of ambiguous regulations. *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). We agree with the district court that the governing regulation is genuinely ambiguous and that the agency's interpretation is reasonable. We also agree with the district court that its review was appropriately

confined to the administrative record the agency produced and that the agency was not required to supplement the record. We therefore affirm.

I

Medicare is a federally subsidized medical insurance program for the elderly and disabled. *See* 42 U.S.C. § 1395 *et seq.*; *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1994). The Centers for Medicare & Medicaid Services (CMS), an agency within HHS, oversees the Medicare program. *See Pharmaceutical Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650 n.3 (2003). CMS contracts with private entities to administer the program. *See* 42 U.S.C. §§ 1395u(a), 1395kk-1(a); 42 C.F.R. § 421.5(b). Each Medicare contractor is responsible for a particular region of the country. 42 C.F.R. § 421.404(b)(1), (c)(1).

To be paid for performing Medicare services, healthcare providers must enroll in the program, at which point they receive billing privileges and a billing number. 42 C.F.R. § 424.505. (The statute distinguishes between hospitals, which it calls "providers," and physicians, whom it calls "suppliers," but because nothing in this case turns on that distinction, we will refer to both as providers. 42 U.S.C. § 1395x(d), (u).) Billing privileges are not permanent—once approved, they may be revoked or deactivated. 42 C.F.R. § 424.555(b). A revocation "means that . . . billing privileges are terminated." *Id.* § 424.502. A deactivation "means that . . . billing privileges were stopped, but can be restored upon the submission of updated information." *Id.* Deactivation exists "to protect the provider . . . from misuse of its billing number and to protect the Medicare Trust Funds from unnecessary overpayments." *Id.* § 424.540(c).

Goffney is a surgical oncologist in Long Beach, California, who has provided services to Medicare patients since 1991. In 2005, Goffney stopped receiving payments for his Medicare claims, but he nonetheless continued to provide services to Medicare patients for the next decade. It is not clear—at least to us—exactly what happened during that period. The record suggests that Goffney provided services, received no payments, and made only occasional efforts to remedy the situation. But the exact sequence of events is not relevant to the legal issue before us.

In 2012, Goffney was informed that his Medicare billing privileges had been deactivated in 2008 because he had not submitted a claim for more than a year. *See* 42 C.F.R. § 424.540(a)(1). Goffney argues that the deactivation was erroneous, but although the regulations provide a mechanism for a provider to challenge a deactivation, Goffney did not invoke that mechanism. *See* 42 C.F.R. §§ 405.374(a), 405.375(a), 424.545(b).

Instead, in 2015, Goffney attempted to reactivate his billing privileges. To do so, he submitted documents to Noridian Healthcare Solutions, the Medicare contractor in his region, verifying that his enrollment information had not changed. Specifically, he submitted portions of Forms CMS-855B, CMS-855I, and CMS-855R—entitled "Medicare Enrollment Application"—which providers use for initial enrollment in the program, reactivation, and various other purposes. Goffney checked the box stating that he was "revalidating [his] Medicare enrollment."

Goffney hoped—and, he says, a Noridian employee represented—that by recertifying the accuracy of his information, he could keep his original effective billing date and be paid for the services he had provided while his privileges were inactive. But when Noridian approved

Goffney's request, it assigned him a new effective date of August 31, 2015—the date on which he had submitted the forms to reactivate his billing privileges. That effective date precluded Goffney from obtaining compensation for services he had performed in the preceding decade.

Goffney sought reconsideration, but Noridian denied his request. It relied on 42 C.F.R. § 424.520(d), which provides that "[t]he effective date for billing privileges for physicians" is "[t]he date of filing of a Medicare enrollment application that was subsequently approved by a Medicare contractor." Reasoning that what Goffney filed on August 31, 2015 was an "enrollment application," Noridian concluded that section 424.520(d) made that date the effective date of his reactivated billing privileges.

Goffney then petitioned for review before an HHS administrative law judge, arguing that a certification attesting to the accuracy of existing enrollment information does not constitute an "enrollment application" under section 424.520(d). The administrative law judge denied Goffney's petition.

The HHS Departmental Appeals Board affirmed. The Board concluded that Goffney had filed a qualifying "enrollment application" and that the effective-date provision of section 424.520(d) controlled. The Board emphasized that no other regulation sets the effective date for Medicare billing privileges. The Board also determined that it lacked authority to consider the circumstances surrounding Goffney's initial deactivation, the Medicare claims he submitted while his billing privileges were inactive, or his equitable arguments about Noridian's representations to him.

Having exhausted his administrative remedies, Goffney sought review of the agency's decision in federal district court. *See* 42 U.S.C. §§ 405(g), 1395cc(h)(1)(A). Goffney asked the district court to order the agency to supplement the administrative record to include additional materials related to the agency's decision. The district court denied the motion.

The district court granted summary judgment to the Secretary of HHS. The court reasoned that HHS regulations contain "a pretty obvious silence . . . about whether a *past* 'effective date' is warranted following reactivation," and therefore the "regulations are 'genuinely ambiguous' in this area." It concluded that the agency's interpretation of the regulations was entitled to deference and that the agency had "provided a reasonable basis for applying the Section 424.520 effective date to [Goffney's] circumstance."

## II

In this appeal, Goffney does not challenge the agency's conclusions about the scope of its authority, nor does he dispute that the agency correctly identified August 31, 2015 as the date on which he submitted his reactivation request. He also does not dispute that under section 424.520(d), "[t]he effective date for billing privileges for physicians [is] the date of filing of a Medicare enrollment application that was subsequently approved." The sole question before us is whether Goffney's reactivation request constituted a "Medicare enrollment application" within the meaning of section 424.520(d), such that its filing date of August 31, 2015 is the effective date of his billing privileges. More specifically, the question before us is whether to accept the Departmental Appeals Board's interpretation of section 424.520(d)'s phrase "Medicare enrollment application."

The Supreme Court has held that an agency's interpretation of its own regulation is entitled to deference when, among other things, the regulation is "genuinely ambiguous." *Kisor*, 139 S. Ct. at 2415. With that in mind, we first "exhaust all the 'traditional tools' of construction" in an effort to interpret the regulation by examining its "text, structure, history, and purpose." *Id.* (quoting *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 n.9 (1984)); *see Minnick v. Commissioner*, 796 F.3d 1156, 1159 (9th Cir. 2015) (per curiam) ("Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction."). Because we conclude that the regulation is ambiguous, we then consider what principles of deference apply.

A

Section 424.520(d) itself does not specify whether a certification submitted to reactivate billing privileges constitutes a "Medicare enrollment application" that triggers a new effective date. The parties direct us to various other provisions of the regulations. One supports Goffney's reading and others support the government's, and they do not clearly resolve the ambiguity.

The regulations contain a definitional section, and because an express textual definition would be controlling, we begin there. *See Burgess v. United States*, 553 U.S. 124, 129–30 (2008). Unfortunately, "Enrollment application" is defined unhelpfully, for our purposes, as "a CMS-approved paper enrollment application or an electronic Medicare enrollment process." 42 C.F.R. § 424.502. "Enroll/Enrollment" are also defined terms, but their definitions shed no more light. *Id.* They refer to "the process that Medicare uses to establish eligibility to submit claims for Medicare-covered items and services," which includes

"validating the provider['s] eligibility to provide items or services to Medicare beneficiaries" and "granting the Medicare provider . . . Medicare billing privileges." *Id.* The reference to "granting . . . billing privileges" could perhaps be construed to encompass the reactivation of billing privileges, but even on that understanding, it would not necessarily follow that a request for reactivation would constitute a "Medicare enrollment application" under section 424.520(d).

Goffney principally relies on 42 C.F.R. § 424.540(b) (2012), entitled "Deactivation of Medicare billing privileges." Although that provision has since been amended, the amendment is not relevant to the issue in this case, and the agency's commentary explains that it was intended simply to reduce "confusion" by "clarif[ying]" the language of the rule. Medicare, Medicaid, and Children's Health Insurance Programs; Program Integrity Enhancements to the Provider Enrollment Process, 84 Fed. Reg. 47,794, 47,839 (Sept. 10, 2019). We therefore confine our analysis to the version of the regulation that was in effect at the time of the events in this case.

Section 424.540(b) outlines two procedures by which a provider can reactivate billing privileges. A provider who has been "deactivated for any reason other than nonsubmission of a claim . . . must complete and submit a new enrollment application to reactivate its Medicare billing privileges or, when deemed appropriate, at a minimum, recertify that the enrollment information currently on file with Medicare is correct." 42 C.F.R. § 424.540(b)(1) (2012). On the other hand, a provider deactivated for nonsubmission of a claim need only "recertify that the enrollment information currently on file with Medicare is correct and

furnish any missing information as appropriate." *Id.* § 424.540(b)(2) (2012).

Goffney emphasizes that only paragraph (b)(1) refers to the filing of a "new enrollment item application." In his view, section 424.540(b) creates a negative implication that when a provider is deactivated for "nonsubmission of a claim"—as Goffney was—the provider need not submit a "new enrollment application." But while that is a reasonable inference, it is not conclusive here. Section 424.520(d) provides for an effective billing date upon the contractor's receipt of an "enrollment application"—unlike section 424.540(b), it does not contain the qualifier "new." So while there is a strong argument that what Goffney filed was not a "*new* enrollment application," his filing might still have been an "enrollment application."

The government points to two other provisions, and while they both support its alternative reading, neither is decisive. First, 42 C.F.R. § 424.515 states that Medicare providers "must resubmit and recertify the accuracy of [their] enrollment information every 5 years," a process that involves submitting an "enrollment application and supporting documentation," *id.* § 424.515(a). That provision suggests that the term "enrollment application" can describe more than just a provider's very first submission to enroll in Medicare—and that a recertification, at least in this context, might be one example of what is included. *Accord id.* §§ 405.818, 424.510(d)(3)(ii) (both using the term "enrollment application" in other contexts that appear not to be restricted to initial enrollment).

Second, the government relies on 42 C.F.R. § 424.555(b), which restricts the government's payment liability by specifying that "[n]o payment may be made for otherwise Medicare covered items or services furnished to a

Medicare beneficiary by a provider . . . if the billing privileges of the provider . . . are deactivated, denied, or revoked." The government reads that provision to mean that a provider cannot ever bill Medicare for services that it renders while its billing privileges are deactivated. If that is true, it logically follows that the effective date of a provider's billing privileges should be reset upon the reactivation of those privileges. *See* 42 C.F.R. § 424.5(a)(2). Goffney responds that section 424.555(b) just means that a provider must have reactivated its billing privileges by the time of payment.

We think the government has the better reading of section 424.555(b) because another regulation provides that the agency will make payments only if "[t]he services [were] furnished by a provider . . . that was, at the time it furnished the services, qualified to have payment made for them." 42 C.F.R. § 424.5(a)(2). That interpretation also accords with section 424.555(c), which states that providers that furnish services for which section 424.555(b) prohibits payment are responsible for "any expense incurred" in providing those services. If a provider could seek retrospective payments once it reestablished its billing privileges, section 424.555(c) would make little sense. Although the regulations do permit retrospective billing in certain narrow circumstances, *see*, *e.g.*, 42 C.F.R. § 424.521(a), HHS has not allowed that practice as a general matter, *see Urology Grp. of NJ, LLC*, DAB No. 2860, 2018 WL 4144023 (H.H.S. 2018) (explaining that "a deactivated provider . . . was not intended to be entitled to Medicare reimbursement for services rendered during the period of deactivation"). Section 424.555 thus supports the government's interpretation of "Medicare enrollment application" in this context.

Finally, we consider the regulatory history and purpose. *See Kisor*, 139 S. Ct. at 2415. The history is not illuminating, and we conclude that considerations of purpose do not meaningfully affect our analysis. Section 424.540(c) states that the agency deactivates billing privileges "to protect the provider . . . from misuse of its billing number and to protect the Medicare Trust Funds from unnecessary overpayments." The government argues that this purpose would be frustrated if the agency had to presume that every claim submitted during a period of deactivation was legitimate, and that to avoid that result, it must set a new effective billing date. That justification makes some sense, especially in a case like this one, in which the provider's billing privileges were apparently inactive for a decade. (To be clear, the record contains no suggestion that any of Goffney's claims were fraudulent.)

On the other hand, regulations, like statutes, often reflect compromises among competing objectives, and "it is quite mistaken to assume . . . that 'whatever' might appear to 'further[] the statute's primary objective must be the law.'" *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) (alteration in original) (quoting *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam)). And even under Goffney's reading of section 424.555(b), the agency would not be required to pay claims submitted during a period of deactivation until after the provider's billing privileges were reactivated. In that situation, the provider would have confirmed the accuracy of its information, so there would be little reason to suspect that past claims were fraudulent. The regulations also set time limits on when claims can be filed—generally within one year of the service, *see* 42 C.F.R. § 424.44—further reducing the concern about fraudulent billing. The regulatory purpose therefore does not help us resolve the textual ambiguity.

B

Because this case "involves an interpretation of an administrative regulation," we must "look to the administrative construction of the regulation if the meaning of the words used is in doubt." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14 (1945). When an agency interprets its own ambiguous regulation, the agency's interpretation is generally "of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* at 414. Although *Seminole Rock* represents one of the Supreme Court's earliest expositions of that principle, the doctrine has come to be associated with the Court's more recent decision in *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

The Supreme Court recently reaffirmed *Auer* deference, but in doing so, it noted some limitations on the doctrine's scope. *See Kisor*, 139 S. Ct. at 2408. The most important limitation is that the regulation must be "genuinely ambiguous." *Id.* at 2415; *Christensen v. Harris County*, 529 U.S. 576, 588 (2000). In other words, a court may not "wave the ambiguity flag" and abandon its interpretive efforts simply because the regulation appears "impenetrable on first read" or "make[s] the eyes glaze over." *Kisor*, 139 S. Ct. at 2415. Instead, a court must first "exhaust all the 'traditional tools' of construction" and consider the regulation's "text, structure, history, and purpose," just as it would "if it had no agency to fall back on." *Id.* (quoting *Chevron*, 467 U.S. at 843 n.9). Even then, it may defer only to an agency interpretation that is "reasonable," *Thomas Jefferson Univ.*, 512 U.S. at 515, in the sense that it falls within the permissible "zone of ambiguity" created by the regulation. *Kisor*, 139 S. Ct. at 2415–16.

Although *Auer* deference to an agency's interpretation of a regulation is conceptually distinct from *Chevron* deference

to an agency's interpretation of a statute, the two forms of deference operate in similar ways. *See Kisor*, 139 S. Ct. at 2416 (rejecting the suggestion that "agency constructions of rules receive greater deference than agency constructions of statutes"). Like *Auer* deference, *Chevron* deference applies only if a court first deems a statute ambiguous after exhausting "traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n.9; *Turtle Island Restoration Network v. United States Dep't of Com.*, 878 F.3d 725, 733 (9th Cir. 2017). And even when a statute is ambiguous at *Chevron* step one, the agency's resolution of the ambiguity must be reasonable to survive step two. *Compare Chevron*, 467 U.S. at 845, *with Kisor*, 139 S. Ct. at 2415–16. In other words, "where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow." *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013); *see United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 493 n.1 (2012) (Scalia, J., concurring in part and concurring in the judgment) ("It does not matter whether the word 'yellow' is ambiguous when the agency has interpreted it to mean 'purple.'"); *Global Tel\*Link v. FCC*, 866 F.3d 397, 419 (D.C. Cir. 2017) (Silberman, J., concurring).

The Court in *Kisor* held that even if those threshold requirements are satisfied, an agency's interpretation must satisfy three other criteria to merit deference under *Auer*. *See Kisor*, 139 S. Ct. at 2416–18. First, the interpretation "must be the agency's 'authoritative' or 'official position,'" and not merely an "ad hoc statement not reflecting the agency's views." *Id.* at 2416 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 257–59, 258 n.6 (2001) (Scalia, J., dissenting)). That means that the interpretation must "emanate from those actors, using those vehicles,

understood to make authoritative policy in the relevant context." *Id.*

Second, "the agency's interpretation must in some way implicate its substantive expertise." *Kisor*, 139 S. Ct. at 2417; *see Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 152–53 (1991). The "most obvious" situation in which that criterion is satisfied is "when a rule is technical." *Kisor*, 139 S. Ct. at 2417. But it can also be satisfied in situations involving "more prosaic-seeming questions" as long as the agency has some "comparative expertise" and the issue is not one that "fall[s] more naturally into a judge's bailiwick." *Id.*; *see City of Arlington*, 569 U.S. at 309 (Breyer, J., concurring in part); *cf. Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649–50 (1990).

Third, the interpretation must reflect the agency's "fair and considered judgment." *Kisor*, 139 S. Ct. at 2417 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)). That does not mean that the agency must engage in an exhaustive interpretive discussion—even an interpretation implicit in an agency's order can reflect the agency's "fair and considered judgment." *See Association of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1252 (D.C. Cir. 1998); *accord Southern Utah Wilderness All. v. Office of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1236 (10th Cir. 2010). Rather, this part of the test protects reliance interests associated with longstanding agency practices or interpretations. Courts may not defer to an interpretation that "creates 'unfair surprise' to regulated parties" or that amounts "to a merely 'convenient litigating position.'" *Kisor*, 139 S. Ct. at 2417–18 (first quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007), and then quoting *Christopher*, 567 U.S. at 155).

C

Applying those principles here, we conclude that the interpretation reflected in the Departmental Appeals Board's decision qualifies for deference under *Auer*. As we have explained, section 424.520(d) is "genuinely ambiguous" in this context, and the agency's reading falls within the permissible zone of ambiguity. *Kisor*, 139 S. Ct. at 2415–16. And the agency's reading meets all three of the additional criteria identified in *Kisor*.

First, the Board's interpretation represents an authoritative statement of the agency. The Secretary of HHS appoints the Board's members, 45 C.F.R. § 16.5(a), and the Board "generally issues HHS's final decision, which may then be appealed to a federal court." *Arizona Health Care Cost Containment Sys. v. McClellan*, 508 F.3d 1243, 1248 n.6 (9th Cir. 2007). The Board's decision is the product of a formal process that merits deference. *Cf. id.* at 1249, 1253–54 (deferring under *Chevron* to the Board's interpretation of an ambiguous statute).

Second, the ambiguity implicates the agency's core expertise because it involves the administration of the Medicare program. *See Kisor*, 139 S. Ct. at 2417. The regulatory scheme allows providers to bill only in certain circumstances and limits their ability to receive Medicare payments depending on their billing status. *See* 42 C.F.R. §§ 424.521(a), 424.555(b). The regulations also reflect HHS's policy of deactivating billing privileges to prevent Medicare fraud and to protect the public fisc. *See* 42 C.F.R. § 424.540(c). The ambiguity here affects the implementation of that policy, and the agency has "comparative expertise" in resolving the issue. *Kisor*, 139 S. Ct. at 2417. *See generally Urology Grp. of NJ*, DAB No. 2860.

Third, far from being a new interpretation or one that would create unfair surprise, the agency's reading is consistent with how it has previously interpreted the relevant regulations. *See Kisor*, 139 S. Ct. at 2417–18; *cf. Christopher*, 567 U.S. at 155–57. CMS's Program Integrity Manual (PIM)—a guidebook that instructs Medicare contractors on how to process provider applications, pay claims, and minimize fraud—has long required contractors to reset providers' effective billing dates when they grant reactivation requests. *See Urology Grp. of NJ*, DAB No. 2860 (explaining that since 2009, the PIM has treated a "reactivation application . . . as an initial enrollment application" for purposes of section 424.520(d) (quoting Medicare Program Integrity Manual § 10.6.1.4 (rev. 289, Jan. 1, 2009))); *see also* Medicare Program Integrity Manual § 15.27.1.2 (rev. 865, Mar. 12, 2019); *id.* § 15.27.1.2.1 (rev. 765, Jan. 1, 2018); *id.* § 15.27.1.2.2 (rev. 765, Jan. 1, 2018). More than a decade ago, the Board recognized, if not tacitly endorsed, that interpretation. *See Arkady B. Stern*, DAB No. 2329, 2010 WL 3810867, at *3 & n.5 (H.H.S. 2010) (interpreting the PIM to mean that "a reactivated provider will have a new effective date"). Indeed, when Noridian denied Goffney's reconsideration request, it cited the PIM for the same principle.

As currently written, section 15.27.1.2.2(A) of the PIM requires providers seeking reactivation to submit a packet of documents that CMS calls a "reactivation certification package," even if their enrollment information has not changed. Section 15.27.1.2 says that if "the contractor approves a provider's . . . reactivation application or reactivation certification package . . . the reactivation effective date shall be based on the date the contractor received the application or [reactivation certification package]." The PIM therefore directly resolves the

ambiguity at issue here. And even though the PIM, like its counterpart in the social security context, "does not impose judicially enforceable duties," *Lockwood v. Commissioner Soc. Sec. Admin.*, 616 F.3d 1068, 1073 (9th Cir. 2010); *see* 42 C.F.R. § 405.1062(a), it still shows that HHS's interpretation is more than just a "convenient litigating position," *Christopher*, 567 U.S. at 155.

Goffney argues that the Board's decision was not a "fair and considered judgment" because it was "*ad hoc*"; it "ignore[d] the plain language of Section 520"; and it did not cite "any legal precedent or administrative rules." We disagree. The Board invoked section 424.520(d), quoted the relevant "recertification" language from section 424.540(b), and recognized that the contractor had "treated [Goffney's request] as an application . . . to reactivate his billing privileges." Even if its analysis could have been more comprehensive, the Board resolved the legal question of whether section 424.520(d) applies to reactivation requests like Goffney's. *See Association of Bituminous Contractors*, 156 F.3d at 1252.

We conclude that the Board's interpretation of section 424.520(d) merits *Auer* deference and controls this case. *See* 519 U.S. at 461. Under that interpretation, Goffney's reactivation request was "a Medicare enrollment application," and its filing date of August 31, 2015 is the effective date of his billing privileges.

## III

The district court did not abuse its discretion in denying Goffney's motion to order HHS to supplement the administrative record. *See Lands Council v. Powell*, 395 F.3d 1019, 1030 n.11 (9th Cir. 2005). Goffney argues that the agency failed to include in the record all materials

related to its decision to assign him an August 31, 2015 effective billing date. In his view, "[t]he missing documents likely show that the Agency's decision was arbitrary and capricious." He does not, however, identify any specific documents that he believes to be missing.

The Administrative Procedure Act requires us to review an agency's action based on "the whole record." 5 U.S.C. § 706. That "includes everything that was before the agency pertaining to the merits of its decision." *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993); *see Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555–56 (9th Cir. 1989) ("The 'whole' administrative record . . . consists of all documents and materials directly or indirectly considered by agency decision-makers." (emphasis omitted) (quoting *Exxon Corp. v. Department of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981))). HHS has codified that requirement in a regulation that directs the Office of Medicare Hearings and Appeals—the agency tasked with compiling the record for HHS administrative proceedings—to include in the record "the appealed determinations, and documents and other evidence used in making the appealed determinations and the ALJ's or attorney adjudicator's decision," as well as any proffered evidence excluded by the adjudicator. 42 C.F.R. § 405.1042(a)(2).

We have explained that a court reviewing an agency's action may examine "extra-record evidence" only in "limited circumstances" that are "narrowly construed and applied." *Lands Council*, 395 F.3d at 1030 (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (per curiam)). Such circumstances are present, for example, when "the agency has relied on documents not in the record" or "when plaintiffs make a showing of agency bad faith." *Id.* (quoting

*Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)); *see Department of Com. v. New York*, 139 S. Ct. 2551, 2573–74 (2019); *Portland Audubon Soc'y*, 984 F.2d at 1548. But like other official agency actions, an agency's statement of what is in the record is subject to a presumption of regularity. *See Angov v. Lynch*, 788 F.3d 893, 905 (9th Cir. 2015). We must therefore presume that an "agency properly designated the Administrative Record absent clear evidence to the contrary." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993); *accord Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019); *see also Angov*, 788 F.3d at 905 ("[I]n the absence of clear evidence to the contrary, courts presume that [government officials] have properly discharged their official duties." (quoting *National Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004))).

Goffney has not presented "clear evidence"—or any evidence at all. His argument rests on speculation that the agency must have considered more documents than it said it had because, in his view, the agency's decision was "unprecedented." As the district court recognized, however, Goffney's petition posed a legal issue, not a factual one. Noridian's denial of Goffney's reconsideration request shows that Noridian reviewed Goffney's application, section 424.520(d), the PIM, and Noridian's policy about its authority to set billing privileges. It does not follow that there must be additional documents underpinning Noridian's decision. Nor is there any indication that the ALJ or the Board relied on any other materials in reaching their decisions.

Goffney also claims that CMS's decision "to deny benefits in this manner appeared only to apply to physicians of color" and that the agency has "manipulate[d] the

administrative record" to shield it from review. In his district court filings, Goffney did not so much as hint at the possibility of racial bias; to the contrary, he stated that "there is no allegation of bad faith in this case." Goffney has provided no evidence of bias, and the record reveals none.

**AFFIRMED.**