**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BLUE MOUNTAINS
BIODIVERSITY PROJECT, an
Oregon non-profit corporation,

*Plaintiff-Appellant*,

v.

SHANE JEFFRIES, in his official
capacity as Ochoco National Forest
Supervisor; UNITED STATES
FOREST SERVICE, an agency of the
United States Department of
Agriculture,

*Defendants-Appellees*.

No. 22-35857

D.C. No.   2:20-
cv-02158-MO

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted March 30, 2023
Seattle, Washington

Filed July 3, 2023

Before:  Jacqueline H. Nguyen and Andrew D. Hurwitz,
Circuit Judges, and Dean D. Pregerson,[*] District Judge.

Opinion by Judge Hurwitz

## SUMMARY[**]

### Environmental Law

The panel affirmed the district court's summary judgment in favor of the U.S. Forest Service in an action brought by Blue Mountains Biodiversity Project ("BMBP") alleging that the Service's approval of the Walton Lake Restoration Project violated the National Environmental Policy Act ("NEPA"), the National Forest Management Act, and the Administrative Procedure Act.

The Forest Service developed the Project to replace trees infested with laminated root rot and bark beetles with disease-resistant ones.  In May 2016, the Service contracted with T2, a private company, for logging to implement the decision. The Service issued a revised Environmental Assessment ("EA") in July 2020 and a revised decision notice in December 2020.  BMBP filed this action challenging the 2020 decision notice.  The Service filed an administrative record ("AR") in 2021.

---

[*] The Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel first addressed BMBP's argument that the AR was incomplete. First, BMBP argued that deliberative materials were part of the "whole record" and that a privilege log was required if they were not included in the AR. The panel held that deliberative materials are generally not part of the AR absent impropriety or bad faith by the agency. Because deliberative materials are not part of the administrative record to begin with, they are not required to be placed on a privilege log. The district court did not abuse its discretion by declining to order the production of a privilege log. Second, BMBP argued that all documents in the 2016 AR should be in the AR for this case. BMBP contended that the documents in the 2016 AR were necessarily before the agency in the 2020 process because the Project was a continuation of the withdrawn one. The panel held that BMBP's arguments failed to overcome the presumption of regularity. The 2020 decision notice expressly stated that the Forest Service began the NEPA process again in 2019. The record also supported the Service's contention that it included only documents from previous NEPA analyses that were considered in the 2020 decision. The panel concluded that the district court acted within its discretion in denying the motion to supplement the AR.

The panel next addressed whether the Service violated NEPA by approving the Project. First, the panel held that BMBP failed to establish that the logging contract with T2 improperly committed resources under any standard. There is also no evidence that the agency merely engaged in post hoc rationalization in the 2020 decision. Second, the panel rejected BMBP's contention that the EA diluted the significance of some impacts by analyzing them on too large a scale. The BMBP did not show why the choice of a

broader context in the challenged instances was arbitrary or capricious. Also, the regulations list ten non-exhaustive relevant factors for consideration. The panel held that whether the factors were assessed individually or cumulatively, the record did not establish a clear error of judgment in the Service's intensity findings, which "refers to the severity of impact" within the selected context. 40 C.F.R. § 1508.27(b).

The panel affirmed the judgment of the district court and lifted the previous stay of its order dissolving the preliminary injunction.

---

## COUNSEL

Jesse A. Buss (argued) and Bridgett A. Chevallier, Willamette Law Group PC, Oregon City, Oregon; Thomas C. Buchele, Earthrise Law Center, Portland, Oregon; for Plaintiff-Appellant.

Robert P. Stockman (argued), Sean C. Duffy, and Joan M. Pepin, Attorneys; Todd Kim, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice; Washington, D.C.; Rick Grisel, Attorney; Rebecca Harrison, Senior Counsel; Office of the General Counsel; Washington, D.C.; for Defendants-Appellees.

# OPINION

HURWITZ, Circuit Judge:

This case involves claims by the Blue Mountains Biodiversity Project ("BMBP") that the approval of the Walton Lake Restoration Project by the U.S. Forest Service violated the National Environmental Policy Act, the National Forest Management Act, and the Administrative Procedure Act. The district court granted summary judgment against BMBP on all claims relevant to this appeal. We affirm.

## BACKGROUND

Walton Lake is a 218-acre recreation site in the Ochoco National Forest in Oregon. The Forest Service developed the Walton Lake Restoration Project ("Project") to replace trees infested with laminated root rot and bark beetles with disease-resistant ones. In 2015, relying on a regulation that excludes the sanitation harvest of trees to control disease and insects from some National Environmental Policy Act ("NEPA") requirements, 36 C.F.R. § 220.6(e)(14) (2015), the Service issued a decision memorandum approving the Project. In May 2016, the Service contracted with T2, a private company, for logging to implement that decision. Although no logging has yet occurred, the T2 contract remains in place.

BMBP sued, challenging the 2015 decision, and the district court preliminarily enjoined the logging on October 18, 2016. The next day, the Service withdrew its decision "to allow additional analysis of the proposed activities." On October 21, 2016, the Service stated that it would undertake

"[a]dditional planning and analysis . . . with the goal of releasing an Environmental [Assessment ("EA")]."[1]

The Service issued an EA and a decision notice approving the Project in 2017 but withdrew the decision notice later that year, citing a need for "additional dialogue and analysis." The Service issued a revised EA in July 2020 and a revised decision notice in December 2020. The revised EA analyzed four alternatives, including a no-action alternative. The selected alternative authorizes thirty-five acres of sanitation logging and 143 acres of commercial and noncommercial thinning to reduce the risk of wildfires and bark beetle infestation. The 2020 decision notice stated that the Project "provides the best opportunity for long-term public enjoyment of this area, with fewer risks of falling trees, and more longevity in the large ponderosa pines that provide much of the scenic quality"; found that there would be no significant environmental impact; and made four Project-specific amendments to the Ochoco National Forest Plan.

BMBP then filed this action challenging the 2020 decision notice. The Service filed an administrative record ("AR") in early 2021. A magistrate judge recommended denial of BMBP's motion to compel completion of the AR and declined to order the Service to produce a privilege log, concluding that certain documents sought by BMBP were deliberative materials, and BMBP did not establish that some documents in the AR filed in response to the 2016 suit were "before the agency" in its 2020 decision. The district judge adopted the magistrate judge's reasoning and denied

---

[1] The district court granted BMBP's motion to dismiss the 2016 suit on June 19, 2017.

the motion, but again preliminarily enjoined any logging for the Project.

The district court later granted the Service summary judgment on all but one of BMBP's claims. It concluded that the logging contract with T2 was not an "irreversible and irretrievable commitment" of resources because it could be unilaterally modified or terminated. It also held that the Service reasonably found that the Project would not have a significant environmental impact and thus reasonably declined to prepare an environmental impact statement ("EIS"). The court entered a final judgment and dissolved the preliminary injunction.[2] BMBP timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.[3]

## DISCUSSION

### I.

We first address BMBP's argument that the AR is incomplete. The Administrative Procedure Act ("APA") requires us to "review the whole record," 5 U.S.C. § 706, including "all documents and materials directly or indirectly considered by agency decision-makers," *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989) (cleaned up). BMBP argues that deliberative materials are part of the "whole record" and that a privilege log is required if they are not included in the AR. It also contends that all documents in the 2016 AR should be in the AR for this case.

---

[2] The district court stayed its order dissolving the preliminary injunction, however, pending our decision on a motion for a stay pending appeal. We granted that stay and expedited this appeal.

[3] The Service has not appealed the district court's grant of summary judgment to BMBP on one of its NEPA claims.

## A.

No previous Ninth Circuit opinion addresses whether deliberative materials are part of the "whole record." District courts in this Circuit are split on the issue. *See Save the Colorado v. U.S. Dep't of the Interior*, 517 F. Supp. 3d 890, 896–97 (D. Ariz. 2021) (collecting cases). The District of Columbia Circuit, however, has held that deliberative materials are generally not part of the AR absent impropriety or bad faith by the agency. *See Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019). We agree.

Our holding rests on two well-settled principles governing judicial review of agency action under the APA. First, "the whole record," 5 U.S.C. § 706, is ordinarily "the record the agency presents," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). "[L]ike other official agency actions, an agency's statement of what is in the record is subject to a presumption of regularity." *Goffney v. Becerra*, 995 F.3d 737, 748 (9th Cir. 2021). Thus, barring "clear evidence to the contrary," we "presume that an agency properly designated the Administrative Record." *Id.* (cleaned up).

Second, we assess the lawfulness of agency action based on the reasons offered by the agency. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Deliberative documents, which are prepared to aid the decision-maker in arriving at a decision, are ordinarily not relevant to that analysis. *See Oceana*, 920 F.3d at 865; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[I]nquiry into the mental processes of administrative decisionmakers is usually to be avoided."), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105

(1977); *Morgan v. United States*, 304 U.S. 1, 18 (1938) (noting it is "not the function of the court to probe the mental processes of the Secretary in reaching his conclusions"). Because deliberative materials are "not part of the administrative record to begin with," they are "not required to be placed on a privilege log." *Oceana*, 920 F.3d at 865 (cleaned up). We agree, however, with the D.C. Circuit that "a showing of bad faith or improper behavior" might justify production of a privilege log to allow the district to determine whether excluded documents are actually deliberative. *Id.*; *see also In re United States*, 875 F.3d 1200, 1211–12 (9th Cir. 2017) (Watford, J., dissenting) (discussing potential circumstances justifying expansion of the AR), *vacated*, 138 S. Ct. 443, 445 (2017).

But, BMBP does not assert any misconduct by the Service, nor does it contend that specific documents were improperly classified as deliberative. Although we leave for another day a detailed exploration of the precise circumstances under which a district court can order the production of a privilege log, the court here did not abuse its discretion by declining to do so in this case.

B.

BMBP also contends that the documents in the 2016 AR were necessarily before the agency in the 2020 process because the Project is a continuation of the withdrawn one. In so arguing, BMBP cites statements by the Service suggesting that the 2020 decision relied on an "additional" NEPA analysis, a District Ranger's description of that analysis as a "continuation of the Walton Lake Restoration analysis and documentation," and the Service's reliance on a 2015 Forest Health Report before the district court and an appellate motions panel.

BMBP's arguments, however, fail to overcome the presumption of regularity. *See Goffney*, 995 F.3d at 748. The 2020 decision notice expressly stated that "[t]he Forest Service began the NEPA process again in 2019 with a scoping letter dated August 7, 2019." The phrase "additional analysis" is not inconsistent with preparing a new AR to support a new NEPA analysis. Nor do the views of a single Service employee necessarily reflect those of the agency or its ultimate decision-maker. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007). The record also supports the Service's contention that it included only documents from previous NEPA analyses that were considered in the 2020 decision. For example, the Service did not cite the 2015 Forest Health Report in its 2020 decision, relying instead on a new 2019 Forest Health Report. And, the Service's citations to the 2015 Report in prior court proceedings did not involve the validity of the 2020 decision but rather a separate 2017 decision to close sections of the recreation site because of safety concerns.

We place a thumb on the scale against supplementation of the AR, *see Goffney*, 995 F.3d at 747–48, and BMBP has not demonstrated how the inclusion of "over two thousand pages that the Service had included in the 2016 AR," would "identify and plug holes in the administrative record," *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010) (cleaned up). Because BMBP "has not met its heavy burden to show that the additional materials sought are necessary to adequately review the Forest Service's decision," *id.*, the district court acted within its discretion in denying the motion to supplement the AR.

## II.

We next address whether the Service violated NEPA by approving the Project.  NEPA imposes "a set of action-forcing procedures that require that agencies take a hard look at [the] environmental consequences" of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (cleaned up).  "Although these procedures are almost certain to affect the agency's substantive decision, . . . NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Id.*

## A.

The Council on Environmental Quality ("CEQ") issues regulations to guide agencies in determining what actions are subject to NEPA requirements.  *See* 40 C.F.R. § 1500.3.[4] Those regulations prohibit an agency from "commit[ting] resources prejudicing selection of alternatives" or taking actions that would "[l]imit the choice of reasonable alternatives." *Id.* §§ 1502.2(f), 1506.1(a)(2).  BMBP contends that the logging contract with T2 violated these regulations.  The parties dispute whether an improper commitment of resources must be "irreversible and irretrievable," *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000) (cleaned up), or something less.  We need not decide that issue, however, because BMBP has failed to establish that the contract improperly committed resources under any standard.

Under the contract, T2 will receive $78,262 to remove non-commercial timber and about $36,000 worth of harvested commercial timber.  Critically, the Service

---

[4] Unless otherwise indicated, all citations are to the 2019 version of the Code of Federal Regulations.

reserved the right to "terminate this contract, or any part hereof, for its sole convenience," at which point T2 "shall immediately stop all work."  48 C.F.R. § 52.212-4(l); *see WildWest Inst. v. Bull*, 547 F.3d 1162, 1169 (9th Cir. 2008) (stressing that the Service "clearly retained the authority to change course or to alter the plan it was considering implementing"); *see also Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 206 (4th Cir. 2005) (holding that preparatory activities did not violate NEPA in part because that they did not "include cutting even a single blade of grass in preparation for construction").  T2 has not conducted any logging under the contract because the Service has not issued a notice to proceed.   And, given the district court's preliminary injunction against logging, which has been stayed pending appeal, no logging can occur until this case is resolved. *See supra* note 2.  Nor has the Service made any payments to T2.

There is also no evidence that the agency "merely engaged" in "post hoc rationalization" in the 2020 decision. *Nat'l Audubon Soc'y*, 422 F.3d at 199.  BMBP argues that an internal email by a Service employee suggests that termination of the contract would cost the Service appropriated dollars and prevent funding of a new project. But, another Service employee explained in the same email chain that any future work under the contract "must adhere to what is in the new NEPA decision" and that pending the outcome of that decision, the Service might need to "terminate[ ] and resolicit[ ]" the contract.

Rather than rely on "the alleged subjective intent of agency personnel divined through selective quotations from email trails," we "look to . . . the environmental analysis itself."  *Id.*  The EA contains no indication that the T2 contract prejudiced or limited the consideration of

alternatives. After analyzing the effects of no action and several alternatives that reduced or eliminated commercial logging, the Service chose the Project because it "best meets the Purpose and Need of Action," would "better meet the management objectives of the area," and "provides the best opportunity for long-term public enjoyment of this area." The Service also stated that it "considered all reasonable alternatives and would not be limited in choice because the final service agreement or other tool of implementation would be written to align with the final decision."

## B.

NEPA mandates an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An agency need not, however, prepare an EIS if it prepares an EA that "briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757–58 (2004). Significance depends on an action's "context" and "intensity." 40 C.F.R. § 1508.27. "Although . . . review under the arbitrary and capricious standard is deferential," an agency's finding of no significant impact is arbitrary or capricious if the petitioner has raised "substantial questions whether a project may have a significant effect on the environment." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212–14, 1216 (9th Cir. 1998) (cleaned up).

## 1.

"Context simply delimits the scope of the agency's action, including the interests affected." *In Defense of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (cleaned up); *see* 40 C.F.R. § 1508.27(a)

(listing potential contexts). Although the agency should be mindful "that use of a larger analysis area can dilute the apparent magnitude of environmental impacts," "[i]dentifying the appropriate geographic scope is a task assigned to the special competency of the appropriate agency." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014) (cleaned up).

BMBP contends that the EA diluted the significance of some impacts by analyzing them on too large a scale. However, "[a]lthough 40 C.F.R. § 1508.27(a) suggests that site-specific actions are generally evaluated in the context of a project locale, nothing in the regulation prohibits the [Service] from exercising its discretion to apply a [larger] analysis when appropriate." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1127 (9th Cir. 2012). And BMBP has not shown why the choice of a broader context in the challenged instances was arbitrary or capricious. *See Ctr. for Cmty. Action & Env't Just. v. FAA*, 18 F.4th 592, 599 (9th Cir. 2021) (noting that the petitioner bears the burden of persuasion); *cf. Anderson v. Evans*, 371 F.3d 475, 489–92 (9th Cir. 2004) (explaining why the local context was especially relevant for assessing whether the project's effects would be controversial).

Indeed, BMBP concedes in its briefing that the 2020 decision "acknowledges the highly-localized nature of the Project's effects" and that the EA contains a "*disclosure* of local impacts." The Service extensively analyzed various local impacts—including those on scenic integrity, on late and old structure stands, and on threatened and endangered species. And, the EA explained why it chose certain broader contexts for analysis in other instances. The record fails to establish that the agency's decisions about context were

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## 2.

Intensity "refers to the severity of impact" within the selected context. 40 C.F.R. § 1508.27(b). The regulations list ten non-exhaustive relevant factors for consideration, including the "[u]nique characteristics of the geographic area"; the "degree to which the effects . . . are likely to be highly controversial"; the "degree to which the action may establish a precedent for future actions with significant effects"; and whether the action "threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id.* Whether the factors are assessed individually or cumulatively, the record does not establish a "clear error of judgment" in the Service's intensity findings. *Blue Mountains Biodiversity Project*, 161 F.3d at 1211 (cleaned up).

Although the EA described Walton Lake as "unique" because it boasts a high number of visitors and is "the only Developed Recreation Management Area that has a lake with the combination of moist mixed conifer and dry mixed conifer forest surrounding it," the Service reasonably found that the Project would affect neither the lake itself, nor "the diversity of tree species in the project area around Walton Lake." The Service also reasonably concluded that the Project "would not substantially affect the use of the area as a recreation site" because the infested area was already closed to recreational uses for safety reasons. And BMBP does not challenge the Service's conclusion that the Project would not affect any of the "unique" characteristics listed in the regulation. *See* 40 C.F.R. § 1508.27(b)(3).

The record also does not suggest that the Project is highly controversial. *See id.* § 1508.27(b)(4). "A project is highly controversial if there is a *substantial dispute* about the size, nature, or effect of the major Federal action," which "exists when evidence ... casts serious doubt upon the reasonableness of an agency's conclusions." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673 (9th Cir. 2019) (cleaned up). But, a project is not rendered highly controversial simply because "qualified experts disagree." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir. 1992). Rather, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

The Service concluded that the Project was not highly controversial because its potential effects were well-established or supported by the best available science. Citing a range of research, the Service found "no evidence that the proposed treatments would exacerbate" laminated root rot. It also decided against stump removal because of "soil disturbance" and "the high cost of removing stumps."

The scientific studies cited by BMBP do not render these findings arbitrary or capricious. One acknowledges that "an appropriate strategy" is "based on several factors"; another expresses some skepticism about sanitation harvesting but also notes the potential effectiveness of "spacing trees through thinning, by removing stumps, or by planting and managing resistant and immune trees species"; and a third does not discuss sanitation harvesting at all. Although BMBP also cites Dr. Chad Hanson's opinion that logging would "likely increase [laminated root rot] occurrence," the Service reviewed that opinion but ultimately concluded that the overall evidence weighed against its conclusions. One

negative comment does not establish high controversy. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1243–44 (9th Cir. 2005).

It was also reasonable for the Service to conclude that the Project is unlikely to establish a precedent for future actions. *See* 40 C.F.R. § 1508.27(b)(6). The Service explained that "no other known Developed Recreation Management Areas . . . have a laminated root rot problem on the Ochoco National Forest." The Service found that the Project is "site-specific" and "any future decision would need to go through the NEPA process." Even if other sites might one day develop similar infestation issues, that does not necessarily make this Project precedential, "especially since any other [project] would be subject to its own NEPA analysis." *WildEarth Guardians*, 923 F.3d at 674.

The Service's decision also reasonably accounted for federal, state, and local laws. *See* 40 C.F.R. § 1508.27(b)(10). Although forest plan amendments that "may create a significant environmental effect" require an EIS, there is an exception for "every plan amendment . . . that applies only to one project or activity." 36 C.F.R. § 219.13(b)(3). The amendments to the Ochoco National Forest Plan at issue are each related to one project.

## CONCLUSION

We **AFFIRM** the judgment of the district court and lift our previous stay of its order dissolving the preliminary injunction.